# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

TANISHA A. SIMMONS, *et al.*,        )
                                     )
            Plaintiffs,              )
                                     )
    v.                               )        CAUSE NO.: 2:12-CV-39-TLS
                                     )
PHILIPS ELECTRONICS NORTH            )
AMERICA CORPORATION,                 )
                                     )
            Defendant.               )

## OPINION AND ORDER

Plaintiffs Tanisha Ann Simmons, Mark Simmons, Sr., and their children Tanisha Marie Simmons and Edward Daniels by Tanisha Ann Simmons as next friend, initiated this product liability suit against the Defendant Philips Electronics North America Corporation. This matter is before the Court on the Defendant's Motion for Summary Judgment [ECF No. 46]. For the reasons stated in this Opinion and Order, the Motion is granted in part and denied in part.

## BACKGROUND

This case arises from an incident involving a 10-month-old child of the Plaintiffs, who was fatally injured on April 9, 2010, when a 27-inch-screen television manufactured by the Defendant fell and landed on the child.

At the time of the incident, the television was located on a dresser in the children's bedroom of the Plaintiffs' home. The television—manufactured in 2005—was 22.5 inches high, 20 inches deep, and weighed between 88–92 pounds. The dresser was 27.33 inches high, 15 inches deep, and weighed 46.5 pounds. The television was placed so that the front of the television lined up with the front edge of the dresser, and the rear of the television was touching

a wall. Because the television contained a cathode ray tube ("CRT") to provide picture, most of the weight was toward the front.

Immediately following the incident, Edward and Tanisha Marie—who were eight-years-old and four-years-old, respectively, at the time—told their mother that Tanisha Marie knocked the television off the dresser while she was climbing on a bunk bed ladder manufactured by COA, Inc., a/k/a/ Coaster Co. of America, Inc. ("COA"). The Plaintiffs' sworn interrogatory responses provide the following description of the incident:

> [Mark Jr.] was injured when a ladder supplied with a bunk bed and which was not affixed or secured to the bunk bed, was used to climb by the decedent's four year old sister [Tanisha Marie]; while climbing on the non-affixed ladder, sister [Tanisha Marie] and the ladder fell and the ladder knocked against the dresser, on which was placed a television, causing the television to fall on [Mark Jr.].

However, during his sworn deposition testimony, Edward offered a conflicting version of the incident. According to Edward, prior to the television falling on Mark Jr., Tanisha Marie held onto the top of the television, while Edward held her by both ankles—one ankle in each hand—and lifted her feet to his chest in a "Superman position." (Edward Dep. 21.) As Tanisha Marie gripped the top of the television, Edward pulled on her three times to release her from the television, and on the third pull, the television allegedly fell forward off the dresser and onto Mark Jr., who was crawling on the floor. Edward said he lied when giving his original description of the incident because he was "scared . . . [of] getting in trouble." (*Id.* 34.) When asked if the "ladder [had] anything to do with the [television] falling," Edward replied, "No." (*Id.* 25.)

Tanisha Ann, who was in a separate room when the television fell, allegedly found the television lying "screenside down" and the dresser standing upright in its "original position."

(Tanisha Ann Dep. 83.) Both Mark Sr. and Tanisha Ann testified that the television demonstrated no signs of instability prior to its fall. Aside from Edward and Tanisha Marie, there were no other witnesses to the incident.

*Warnings/Safety Instructions*

Mark Sr. testified that he purchased the television at a pawn shop. At the time of purchase, the television was removed from its original packaging, and therefore, did not include a user manual. The user manual issued with the television model at issue contains, in relevant part, the following warnings under the heading, "IMPORTANT SAFETY INSTRUCTIONS":

> 12. Use only with a cart, stand, tripod, bracket, or table specified by the manufacturer, or sold with the apparatus. When a cart is used, use caution when moving the cart/apparatus combination to avoid injury from tip-over.
>
>    *  *  *
>
> 17. **Tilt/Stability** – All televisions must comply with recommended international global safety standards for tilt and stability properties of its cabinet design.
>
>  • Do not compromise these design standards by applying excessive pull force to the front, or top, of the cabinet which could ultimately overturn the product.[1]

The only external warning was located on the back of the television and it cautioned against the risk of electric shock if a consumer removes the television's cover, as required by Underwriter Laboratories ("UL") Standard No. 6500.[2]

---

[1]Safety Instruction 12 also includes a graphic, which appears to depict a television tipping over while placed on a cart.

[2]According to the Defendant, Underwriters Laboratories "is a safety consulting and certification company . . . that provides safety-related certification, validation, testing, inspection, auditing, advising

*Tip-Over Hazard*

In their sworn submissions, the Plaintiffs show that, as early as 1998, the Consumer Electronic Association ("CEA") Product Safety Working Group—whose membership includes the Defendant and other electronics manufacturers—held meetings where the tipping of televisions was discussed. Notes from a 1998 meeting, which was attended by a representative of the Defendant, referenced a study published in the Pediatrics Journal showing that "73 cases of fallen TV sets [were] reported to the [Consumer Product Safety Commission (CPSC)] during the 7 year period investigated, 28 resulted in death [and] 38% of these deaths were attributed to [televisions] placed on stands or dressers." (CEA Ex. 1, ECF No. 49–2.) The notes further state that "[the group] [n]eeds to see if it is possible to standardize [a] bracket in TV designs for securing TV to stand." (*Id.*)

On August 2, 2000, CEA's Vice President of Technology and Standards sent a letter to the Underwriters Laboratory, which referenced CPSC data showing "that there were many serious injuries and several children's deaths as the result of television sets not being adequately stable." (CEA Ex. 9, ECF No. 49–2.) As a result, the letter includes a proposal to amend UL stability requirements to require specified televisions to withstand a force of 20 percent or less of its weight without tipping over. The letter notes that "[b]esides television and furniture design requirements, an important aspect to reducing even the small number of incidents, is consumer education." (*Id.*) That same year, the CEA issued an informational flyer that warned consumers of the risk to children created by the placement of televisions on furniture. The flyer

---

and training services . . . [to] manufacturers, retailers, policymakers, regulators, service companies, and consumers." (Def's App. 9, n. 38; ECF No. 53.)

recommended that consumers "[u]se appropriate angle braces, straps and anchors to secure your furniture to the wall." (CEA Ex. 8, ECF No. 49–2.)

Wendell Johnson, a former employee of the Defendant, testified on the Defendant's behalf. During his employment with the Defendant, Johnson served as a member of the CEA Product Safety Working Group from approximately 2005 to 2011, and the UL Standards Technical Panel from approximately 1998 to 2011. As a member of the Product Safety Working Group, Johnson confirmed that he attended meetings where the "tip-over of televisions and their placement on furniture" was discussed. (Johnson Dep. 18–19.) In particular, group discussions pertained to the tip-over hazard created by the placement of CRT televisions on dressers located in children's rooms. (*Id.* at 19, 27.) Johnson acknowledged that group members were generally aware of an increase in child injuries caused by tip-over incidents between 2001 and 2005. (*Id.* at 44.) Consequently, the group discussed "different ways to inform the consumer," which included the issuance of a postsale warning. (*Id.* at 20, 27.) Johnson agreed that televisions with screen sizes between 20–30 inches were more likely to tip-over, and that placement of a television on a dresser posed "the greatest risk" of a tip-over. (*Id.* at 34, 49.)

Nonetheless, Johnson said the television model at issue complied with UL standards for stability; namely, the television passed horizontal and vertical force tests.[3] Johnson also said the user manual incorporated 14 UL-required safety instructions, including one safety instruction

[3]Johnson offered the following description of the stability tests: "[T]here were certain tests performed on the television. One was called a horizontal force test, and one was called a vertical stability test and that is where you took a percentage of the weight of the television, and you would take that weight, and you would apply pressure [on the television] to try to get it to tip over. And in order to pass the test the TV could not tip over." (Johnson Dep. 13–14.) The horizontal force test entailed applying pressure on "the rear" of the television, and the vertical force test entailed applying pressure "downward on the front" of the television. (*Id.*) According to the Plaintiffs' expert, the subject television was required to withstand 13 percent or less of its weight without tipping over. (Lehto Aff. 3.)

related to stability. According to Johnson, the Defendant did not include mounting hardware with televisions due to concerns that consumers may experience electric shock while inadvertently turning a mounting screw into the television. However, the Defendant did sell commercial models of the television with mounting screws.

### Expert Testimony

The Plaintiffs submitted expert reports from Mark R. Lehto, an industrial engineer specializing in "safety, human factors, ergonomics and warnings," (Lehto Report 1), along with Lewis C. Barbe, a safety engineering expert. Lehto, in compiling his report, conducted measurements of the force required to tip-over the television when placed on the dresser. Lehto found that applying 12.5 pounds of force—a force equaling 13.6 percent of the television's weight—will "start to tip-over" the television when applied at a 90-degree angle and at the center of the television. (*Id.* at 4.) Lehto also found that applying 10 pounds of force will "cause [the television] to start tipping" when applied on the "top front edge of the television." (*Id.*). Lehto concluded that the television "presents a severe risk of injury" when placed on a piece of furniture, and that "the tip-over hazard created by the design of the television . . . creat[es] an unreasonable level of risk during forseeable uses of the product." (*Id.* at 4–5.)

In Barbe's report, he asserted that safety engineering controls require the Defendant to "properly furnish [televisions] with instructions and warnings for the foreseeable uses and [misuses] as known to them or should have been known to them." (Barbe Report 4.) Barbe stated that, due to the documented instances of child injuries caused by television tipping, warnings "should have been placed on the [Defendant's] television as prominently, and with equally

prominent lettering, as the warning relating to electrical shock." (*Id.* at 5.) He concluded that,

without a "prominent" furniture tip-over warning, the television was "inadequately labeled to

warn potential consumers of the dangers of tip over." (*Id.* at 6, 8.)

The Defendant submitted an expert report from Steven R. Arndt, an industrial engineer in

"Exponent's Human Factors practice," [ECF No. 48–7, at 29] who, in part, responded to the

Plaintiffs' expert reports. Arndt countered that "a television is not a hazard until it is put onto an

appropriate stand and subjected to unintended forces." (*Id*. at 19.) Arndt concluded that the

subject television "and other similar designs are not unreasonably dangerous when used in a

foreseeable manner." (*Id*. at 4.)


***Plaintiffs' Claims***

The Plaintiffs' Complaint contains claims of strict liability, negligence, and breach of

warranty against the Defendant.[4] In relevant part, the Plaintiffs assert that the subject television

is defective and unreasonably dangerous under Indiana law. The Defendant filed a Motion for

Summary Judgment [ECF No. 46] on March 6, 2014. Also pending is the Plaintiffs' Motion to

Strike [ECF No. 51], filed on March 31, 2014, and the Defendant's Motion to Strike [ECF No.

62], filed on April 17, 2014. All pending motions are ripe for ruling.



**LEGAL STANDARD & MOTIONS TO STRIKE**

---

[4]The Complaint also contains claims against COA. However, on May 9, 2013, the Plaintiffs and
COA filed a Stipulation of Dismissal [ECF No. 25] requesting that the Court dismiss with prejudice their
claims against COA. On May 30, 2013, the Court issued an Opinion and Order [ECF No. 29] granting the
Stipulation of Dismissal.

**A**.      **Summary Judgment Standard**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. A court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

**B**.      **Plaintiffs' Motion to Strike**

The Plaintiffs' Motion to Strike asks the Court to strike portions of the Defendant's Brief in Support of the Motion for Summary Judgment [ECF No. 47] as inadmissible hearsay.

As the Court addresses the legal issues presented by the Defendant's Motion for Summary Judgment and analyzes the facts under the governing procedural and substantive law, the Court will consider the admissibility of the Defendant's evidence, determine whether there

are any irrelevant, inadmissible, conclusory, or speculative assertions that should be disregarded, and deal with them accordingly. To the extent that any of the Defendant's evidence would be inadmissible if the Defendant were to offer them at trial, the Court will not consider them. Where exhibits do not go to facts that are outcome determinative under the applicable law, the Court will likewise ignore them. Consequently, there is no need to strike any part of the Defendant's Brief, and the Court will deny the Plaintiffs' Motion to Strike on this basis.

The Plaintiffs' Motion also requests for the Court to strike Arndt's expert report because, at the time the Motion to Strike was filed on March 31, 2014, the report was unsworn. On April 2, 2014, the Defendant filed a sworn statement verifying the expert report [ECF No. 52], and informed the Court that the unsworn report was due to an "oversight" [ECF No. 55]. Because the Defendant quickly corrected the deficiency and also previously disclosed the expert report—albeit unsworn—in a timely manner, the Court finds that the Plaintiffs have not suffered prejudice, and therefore, will not strike the Defendant's expert report. *See Harpold v. Ethicon Endo–Surgery, Inc.*, No. 1:06–CV–1666, 2009 WL 688984, at *1 (S.D. Ind. March 11, 2009) (finding that where the plaintiff submitted the expert affidavit after filing its motion for summary judgment, "[t]he belated affidavit [was] sufficient to support the use of the report at the summary judgment stage").


C.      **Defendant's Motion to Strike**

The Defendant's Motion to Strike asks the Court to strike certain portions of the affidavits of Lehto and Barbe because they supplement the expert reports.

When a party intends to introduce an expert witness, the party must disclose "a written

9

report—prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2)(B). The report "must contain: (I) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them." *Id.* "The purpose of the report is to provide adequate notice of the substance of the expert's forthcoming testimony and to give the opposing party time to prepare for a response." *Meyers v. Nat'l R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734 (7th Cir. 2009). Non-compliance with Rule 26(a)(2)(B) will result in "exclusion of an expert's testimony ... 'unless the failure was substantially justified or is harmless.'" *Gicla v. United States*, 572 F.3d 407, 410 (7th Cir. 2009) (quoting Fed. R. Civ. P. 37(c)(1)). Additionally, "where the deposition testimony is ambiguous or incomplete . . . the witness may legitimately clarify or expand upon that testimony by way of an affidavit." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1007 (7th Cir. 1999).

After extensive review of the reports and affidavits of Lehto and Barbe, the Court disagrees with the Defendant and will not strike either affidavit. The portions of the affidavits that the Defendant objects to, in large part, either expand upon or clarify opinions previously disclosed in the expert reports. As such, the Court is not convinced that the Defendant has been deprived of "adequate notice of the substance of the expert's forthcoming testimony" or has suffered any prejudice in not having the additional information prior to the July 1, 2013, deadline to deliver expert witness disclosures and reports. Accordingly, the Court finds that the affidavits, at this stage of the litigation, are harmless under Federal Rule of Civil Procedure 37(c)(1), and will not strike either affidavit.

**DISCUSSION**

"A federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it sits." *Land v. Yamaha Motor Corp.*, 272 F.3d 514, 516 (7th Cir. 2001) (citation omitted). The Indiana Products Liability Act (IPLA), codified at Indiana Code §§ 34-20-1-1 *et seq.*, governs all actions that are: "(1) brought by a user or consumer; (2) against a manufacturer or seller; and (3) for physical harm caused by a product; regardless of the substantive legal theory or theories upon which the action is brought." Ind. Code § 34-20-1-1. Neither party disputes that the Plaintiffs' claims are governed by IPLA.

To establish a prima facie case of liability under IPLA, "the plaintiff must show that (1) the product is defective and unreasonably dangerous, (2) the defective condition existed at the time the product left the defendant's control, and (3) the defective condition is the proximate cause of the plaintiff's injuries." *Natural Gas Odorizing, Inc. v. Downs*, 685 N.E.2d 155, 160 (Ind. Ct. App. 1997). A product may be defective within the meaning of IPLA because of a manufacturing flaw, a design defect, or a failure to warn of the dangers associated with the product's use. *Cook v. Ford Motor Co.*, 913 N.E.2d 311, 319 (Ind. Ct. App. 2009). Additionally, if the plaintiff presents a design defect or failure to warn claim, the plaintiff must also establish that the manufacturer failed to exercise reasonable care under the circumstances. *Id.*

Also, IPLA creates a rebuttable presumption that a product is not defective and that the manufacturer was not negligent if the product:

(1)     was in conformity with the generally recognized state of the art applicable to the safety of the product at the time the product was designed, manufactured, packaged, and labeled; or

(2)     complied with applicable codes, standards, regulations, or specifications established, adopted, promulgated, or approved by the United States or by Indiana, or by an agency of the United States or Indiana

Ind. Code § 34-20-5-1. However, "[t]his presumption may be rebutted, at least for purposes of

summary judgment, if the designated evidence demonstrates a question of fact remains as to

whether the product was defective." *Miller v. Bernard*, 957 N.E.2d 685, 696 (Ind. Ct. App.

2011).

The Plaintiffs assert that the subject television is defective in two of the three areas of

product defect: warning and design. Specifically, the Plaintiffs claim that the television's alleged

instability upon application of force, and its lack of a warning thereof, caused Mark Jr.'s death.[5]


## A.    Causation

Before analyzing the Plaintiffs' failure to warn and design defect claims, the Court must

briefly address the factual uncertainty surrounding this case—particularly, Edward's conflicting

accounts of the incident. *See Patton v. MFS/Sun Life Fin. Distrib., Inc.*, 480 F.3d 478, 488 (7th

Cir. 2007) ("[A] court must examine the particular circumstances of a change in testimony to see

whether it is plainly incredible or merely creates a credibility issue for the jury.")

The Defendant argues that Edward's deposition testimony shows that Tanisha Marie

---

[5]The Plaintiffs expressly disclaim any allegations of a manufacturing defect. (Pl's Br. 22; ECF
No. 50) Further, because IPLA supplants products liability common law claims, the Plaintiffs' claim for
breach of warranty merges with their IPLA claims for failure to warn and design defect. *See Gardner v.
Tristar Sporting Arms, Ltd.*, No. 1:09-CV-0671, 2010 WL 3724190, at *2 (S.D. Ind. Sept. 15, 2010);
*Cincinnati Ins. Cos. v. Hamilton Beach/Proctor–Silex, Inc.*, No. 4:05-CV-49, 2006 WL 299064, at *3
(N.D. Ind. Feb. 7, 2006). Similarly, the Plaintiffs' strict liability and negligence claims merge under a
design defect or failure to warn theory. *See Marshall v. Clark Equip. Co.*, 680 N.E.2d 1102, 1105 (Ind.
Ct. App. 1997). And lastly, although not referenced in their brief, the Plaintiffs claim that Tanisha Ann,
Mark Sr., Tanisha Marie, and Edward "suffered a negligent infliction of emotional distress in having
directly witnessed all or a part of the injury" caused by the Defendant. However, IPLA requires that a
plaintiff suffer physical harm. Ind. Code § 34-20-1-1. Because the Plaintiffs have presented no evidence,
as far as the Court can tell, of any physical harm suffered by the named plaintiffs, the claim necessarily
fails as a matter of law. *See Doerner v. Swisher Int'l, Inc.*, 272 F.3d 928, 932 (7th Cir. 2001) ("The plain
language of the IPLA requires . . . a physical harm caused by a product . . . [and] [m]ental distress does
not qualify as a physical harm.") (internal quotation marks and citation omitted).

"pulled" the television off the dresser, and thus, necessarily precludes any reasonable inference that the television tipped over. (Def's Br. 7.) ("Many of the opinions in Plaintiffs' expert reports focus on the force necessary to cause a television to tip over at a certain angle using the front edge of the television as a fulcrum point. However, there is no testimony that this happened."). The Plaintiffs counter that either version of Edward's account creates a reasonable inference that the television tipped over. (Pl's Br. 12–13.)

But given the unique circumstances of Edward's change in testimony, along with the record as a whole—a record that is heavily reliant on the credibility of child witnesses—the Court is not in a position to make a conclusive factual determination. Such a determination requires the benefit of live testimony, and thus, is more appropriately the province of a jury. Based on this record, the Court finds that a reasonable juror is not precluded from determining that Mark Jr.'s death was the result of the alleged tip-over hazard.

**B.      Failure to Warn Claim**

The Plaintiffs argue that the television is defective because the Defendant failed to warn or provide adequate instructions as to the alleged tip-over hazard.

A product is defective for a failure to warn if a seller fails to: "(1) properly package or label the product to give reasonable warnings of danger about the product; or (2) give reasonably complete instructions on proper use of the product; when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer." Ind. Code § 34-20-4-2. While "[t]he adequacy of warnings is classically a question of fact reserved to the trier of fact and, therefore, usually an inappropriate matter for summary

judgment," *Jarrell v. Monsanto Co.*, 528 N.E.2d 1158, 1162 (Ind. Ct. App. 1988), "[t]he determination of whether a duty to warn exists is generally a question of law for the court to decide rather than one of fact," *Natural Gas Odorizing, Inc.*, 685 N.E.2d at 161.

### 1.     *Duty to Warn*

"Absent proof of a dangerous instrumentality, or proof of a defect or improper design making an otherwise harmless instrument dangerous, there is no duty to warn of product connected dangers." *Am. Optical Co. v. Weidenhamer*, 457 N.E.2d 181, 187 (Ind. 1983). However, "[a] manufacturer has a duty to warn with respect to latent dangerous characteristics of the product, even though there is no 'defect' in the product itself." *Natural Gas Odorizing, Inc.*, 685 N.E.2d at 161 ("A failure to warn of a latent danger will, without more, cause the product to be unreasonably dangerous as marketed."). A duty to warn also arises if a misuse is reasonably expected by the manufacturer or if the manufacturer knows that its product is being widely misused. *Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326, 1343 (7th Cir. 1995). However, "[n]o additional warnings need to be furnished where such warnings would not supplement the user's understanding of the nature and characteristics of the product." *Weigle v. SPX Corp.*, 729 F.3d 724, 733 (7th Cir. 2013).

First, the Defendant argues that no duty to warn existed because the alleged tip-over hazard was not latent, but was "open and obvious." (Def's Br. 21.) The Defendant specifically claims that "the fact that [the] television is heavy is not hidden and is easily observable." (*Id.*) "Although obviousness typically factors in the equation for the jury . . . there are some cases where the case is so one-sided that there is no possibility of the plaintiff's recovery." *Bourne v.*

*Marty Gilman, Inc.*, 452 F.3d 632, 637 (7th Cir. 2006); *see also Anderson v. P.A. Radocy &*

*Sons, Inc.*, 67 F.3d 619, 626 (7th Cir. 1995) ("There is a presumption against granting summary

judgment on the basis of the open and obvious danger rule in Indiana."). For example, in *Welch*

*v. Scripto-Tokai Corp.*—a case cited by the Defendant—a plaintiff sued a manufacturer of a

disposable butane lighter after a three-year-old child suffered an injury by climbing on a shelf

and igniting the lighter. 651 N.E.2d 810, 812 (Ind. Ct. App. 1995). The court held that the

defendant had no duty to warn because "the lighter had no hidden defects" and that the "dangers

inherent in the product . . . were open and obvious." *Id.* at 813. The court specifically noted that

"the physical characteristics of the lighter, including the fact that it would ignite when one

pushed down on the thumb lever . . . could be directly observed." *Id.* at 816; *see also Ragsdale v.*

*K-Mart Corp.*, 468 N.E.2d 524, 527 (Ind. Ct. App. 1984), *abrogated on other grounds by Koske*

*v. Townsend Eng'g Co.*, 551 N.E.2d 437 (Ind. Ct. App. 1990), (a blade of a lawnmower "poses

an open and obvious danger as a matter of law to one placing a hand into the running mower,

particularly after the user has lifted the guard chute from its protective location"); *Bourne v.*

*Marty Gilman, Inc.*, No. 1:03-CV-1375, 2005 WL 1703201, at *6 (S.D. Ind. 2005) (manufacturer

of goal posts was not liable for plaintiff's injuries because "the general danger that a tall

structure of metal pipes could injure someone as it fell under the weight of fans was objectively

obvious to a reasonable bystander").

But unlike the above cases, the Plaintiffs' evidence suggests that the average consumer is

unaware of the alleged risk posed by CRT televisions. *See Ford Motor Co. v. Rushford*, 868

N.E.2d 806, 810 (Ind. 2007) ("[a] product may be defective under the [IPLA] where the

manufacturer fails in its duty to warn of a danger or instruct on the proper use of the product as

to which the average consumer would not be aware.") As early as 1998, the CEA recognized the need to promote "public awareness education" related to television tipping, which led to the issuance of an informational flyer warning consumers that "TV sets may fall over and may cause unnecessary injury" if "improperly secured or inappropriately situated." (CEA Ex. 8.) And during his testimony, Johnson admitted that the group focused on "different ways to inform the customer," including the issuance of postsale warnings. (*Id.* at 20, 27.).

The evidence also suggests that the Plaintiffs' use—or misuse—of the Defendant's product was reasonably foreseeable. During his testimony, Johnson acknowledged that customers "will place televisions . . . in [areas] that are unsafe." (Johnson Dep. 13.) In particular, Johnson noted that CEA discussions focused on the placement of CRT televisions on dressers located in children's rooms. Johnson acknowledged that televisions with screen sizes between 20–30 inches were more likely to tip over, and that placement of a television on a dresser posed "the greatest risk" of a tip-over hazard." (*Id.* at 34, 39.) As such, a juror may reasonably conclude that the Plaintiffs' placement of a 27-inch CRT television on a dresser in their children's room should have been anticipated by the Defendant. *See Natural Gas Odorizing, Inc.*, 685 N.E.2d at 162 ("[the] duty to warn follows from the manufacturer's duty to anticipate the foreseeable uses of its product").

Alternatively, the Defendant argues that both Mark Sr. and Tanisha Ann were subjectively aware of the weight of the television—particularly its weight toward the front—and that, therefore, a warning would not have supplemented their understanding of the nature and characteristics of the product. For support, the Defendant cites *Clark v. Oshkosh Truck Corp.*, where a plaintiff sued a manufacturer after suffering injury due to a slip-and-fall on the rollback

bed of a truck. No. 1:07–CV–0131, 2008 WL 2705558 (S.D. Ind. Jul. 10, 2008). The court held, in part, that the defendant had no duty to warn "because the conditions of the rollback bed were contemplated by [the plaintiff], who was personally aware of the slick nature of the rollback bed." *Id.* at *4.

But unlike the plaintiff in *Clark*, neither Mark Sr. nor Tanisha Ann testified that they were personally aware of the risk posed by the television; namely, its alleged proclivity to tip over under certain conditions. During her deposition, Tanisha Ann testified that, although she was aware of the television's weight distribution, she was unaware that such an attribute may create a tip-over hazard:

> [Question:] If something is top heavy, generally speaking, do you believe, in your experiences, that that's something that would have a greater tendency to tip over?
>
> [Answer:] I'm not sure because, I mean, I really haven't dealt with things like that just on the specifics of this . . . I think heavy is heavy.

(Tanisha Ann Dep. 67–68.) And aside from his statement that he needed to carry the television with the "screen towards [him]," Mark Sr. offered no testimony to establish a subjective awareness that its weight distribution creates a tip-over hazard.

When viewing the facts in a light most favorable to the Plaintiffs and drawing all reasonable inferences therefrom, the Court cannot determine, as a matter of law, that a warning would not have supplemented the Plaintiffs' "understanding of the nature and characteristics of the [Defendant's] product." *Weigle*, 729 F.3d at 733. Furthermore, because the alleged risk posed by the subject television was not open and obvious—or in other words, "so one-sided that there is no possibility of the plaintiff's recovery," *Bourne*, 452 F.3d at 637—and because the record creates a reasonable inference that the Plaintiffs' use of the television was foreseeable, the Court

is persuaded that a reasonable jury could find that the Defendant owed a duty to warn.

## 2.    *Adequacy of Warning*

The duty to warn consists of two duties: (1) to provide adequate instructions for safe use; and (2) to provide a warning as to dangers inherent in improper use. Ind. Code § 34-20-4-2; *see Deaton v. Robinson*, 878 N.E.2d 499, 501 (Ind. Ct. App. 2007); *Coffman v. PSI Energy, Inc.*, 815 N.E.2d 522, 527 (Ind. Ct. App. 2004).

Neither party disputes that the only external warning on the subject television pertained solely to the risk of electric shock if a consumer removes the television's cover. And although the user manual included safety instructions related to the "Tilt/Stability" of the television, the safety instructions did not expressly reference the risk to children created by the alleged tip-over hazard. As a result, the Plaintiffs' expert concluded that such warnings were inadequate in light of the documented instances of child injuries.

Given that "[t]he adequacy of warnings is classically a question of fact reserved to the trier of fact," *Jarrell*, 528 N.E.2d at 1162, the Court finds that a question of fact exists as to whether the Defendant's warning was adequate. Consequently, the Plaintiffs' failure to warn claim survives summary judgment.

## C.    Design Defect Claim

The Plaintiffs also claim that the television was defectively designed. A product is defectively designed if, at the time it is conveyed by the seller to another party, it is in a condition: "(1) not contemplated by reasonable persons among those considered expected users

18

or consumers of the product; and (2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expected ways of handling or consumption." Ind. Code § 34-20-4-1; *Baker v. Heye-Am.*, 799 N.E.2d 1135, 1140 (Ind. Ct. App. 2003). To prevail on a design defect claim "the plaintiff must show not only that the design is defective but also that the defective product is unreasonably dangerous." *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 657 (7th Cir. 1998) (internal quotation marks and citation omitted). The requirement that the product be in a defective condition focuses on the product itself; while the unreasonably dangerous requirement focuses on the reasonable expectations of the consumer. *Id.* Additionally, "Indiana [law] requires the plaintiff to show that another design not only could have prevented the injury but also was cost-effective under general negligence principles." *Whitted v. Gen. Motors Corp.*, 58 F.3d 1200, 1206 (7th Cir. 1995) (internal quotation marks and citation omitted).

First, in terms of the product itself, the Plaintiffs have marshaled sufficient evidence to show a defective condition. Lehto's expert report indicates that applying 12.5 pounds of force—a force equaling 13.6 percent of the television's weight—will "start to tip-over" the subject television when applied at a 90-degree angle and at the center of the television. (Lehto Report 4.) Lehto also found that applying 10 pounds of force will "cause [the television] to start tipping" when applied on the "top front edge of the television." (*Id.*). As a result, Lehto concluded that the television posed a "tip-over hazard [that was] created by the design of the television" and that such a design "creat[es] an unreasonable level of risk during forseeable uses of the product." (*Id.* at 4–5.) As a proposed alternative design, Lehto opines that a "tethering device as used on furniture . . . was technologically feasible and available prior to 2005." (*Id.* at 4.)

In addition to arguing that the subject television should have included a tethering device or other mounting hardware, the Plaintiffs claim that the subject television should have been designed to withstand a greater application of force. In support of this argument, the Plaintiffs submitted sworn evidence demonstrating that the CEA, in light of CPSC data showing "that there were many serious injuries and several children's deaths as the result of television sets not being adequately stable," (CEA Ex. 9), drafted a proposal to modify television design requirements; namely, to require specified televisions to withstand a force of 20 percent or less of its weight without tipping. According to the Plaintiffs' expert, the subject television would have failed such a requirement. Based on this record, and when viewing the record in a light most favorable to the Plaintiffs, a reasonable juror is not precluded from finding that the subject television contained a defective condition, and that an alternative design (e.g., a design that withstands a greater application of force) was reasonably feasible.

An issue of material fact also exists as to whether the Defendant's product was unreasonably dangerous. A product is "unreasonably dangerous" if it poses a risk of physical harm beyond the expectations of an ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers. Ind. Code § 34-6-2-146.

The Defendant argues, again, that the subject television was not "unreasonably dangerous" because it posed an open and obvious risk. Indeed, "[o]bviousness remains a relevant inquiry because . . . the question of what is unreasonably dangerous depends upon the reasonable expectations of consumers and expected uses." *Bourne*, 452 F.3d at 637; *see also Mesman v. Crane Pro Servs., a Div. of Konecranes, Inc.*, 409 F.3d 846, 850–851 (7th Cir. 2005) (finding that an open and obvious risks represents "circumstantial evidence that the user of the product

knew of the danger . . . and it also bears on whether the risk was great enough to warrant protective measures beyond what the user himself would take"). But as the Court previously noted, the Plaintiffs have submitted evidence to suggest that the alleged risk posed by the subject television is not open and obvious to the average consumer. The testimony of Johnson, coupled with the sworn evidence related to CEA meetings suggest as much. Nor is there evidence to establish that Mark Sr. and Tanisha were subjectively aware of the alleged tip-over hazard.

An illustrative case in this context is *Beaver v. Howard Miller Clock Co.*, a case involving a product liability claim against a manufacturer of a grandfather clock after the clock tipped over—by application of force—and fell on a child. 852 F. Supp. 631, 636 (W.D. Mich. 1994). In finding against the plaintiff's design defect claim, the court underscored the plaintiff's failure to produce sufficient evidence of tip-over incidents involving grandfather clocks to establish an unreasonable danger. *Id.* at 637 ("[The plaintiff's] evidence merely serves to highlight the uncertainty that accidents involving grandfather clocks occur with any frequency. [I]n view of this uncertainty, plaintiff therefore bears a heavy burden of showing that [the Defendant's] chosen design was unreasonably dangerous"). In contrast, the Plaintiffs have submitted evidence that, by 1998, the CEA was aware of at least 73 cases of televisions tipping over on children, 28 of which resulted in death. (CEA Ex. 1.) In his testimony, Johnson also acknowledged that CEA group members were aware of an increase in child injuries caused by tip-over incidents between 2001 and 2005. Such evidence suggests that, at the time the subject television was manufactured, tip-over incidents were neither infrequent nor uncertain.

Accordingly, when viewing the evidence in a light most favorable to the Plaintiffs, a reasonable juror is not precluded from determining that the Defendant's product was defectively

designed. The Plaintiffs' design defect claim should also proceed to trial.[6]


# CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment [ECF No. 46] is GRANTED IN PART as to the Plaintiffs' negligent infliction of emotional distress claim, and DENIED IN PART as to the Plaintiffs' failure to warn and design defect claims. The Court also DENIES the Plaintiffs' Motion to Strike [ECF No. 51] and the Defendant's Motion to Strike [ECF No. 62]. The Court SETS a telephonic status/scheduling conference for April 16, 2015, at 3:00 PM. The Court will initiate the call.

SO ORDERED on March 27, 2015.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION

---

[6]The Court notes the Defendant's argument that, pursuant to Ind. Code § 34-20-5-1, there exists a rebuttable presumption that the subject television was not defective because the television "complied with all applicable agency standards, regulations, and specifications." (Def's Br. 8.) But the Court need not conclusively determine whether the rebuttable presumption is triggered because, again, "[t]his presumption may be rebutted, at least for purposes of summary judgment, if the designated evidence demonstrates a question of fact remains as to whether the product was defective." *Bernard*, 957 N.E.2d at 696. As discussed above, the Court finds that a question of fact remains as to whether the subject television is defective.